## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MICHAEL LOYD**                    :
493 West Martin Street        :
East Palestine, Ohio 44413     :

                                : CASE NO. _____

        and                 :
                                :

**ZOEY SPELLMAN**            : JUDGE _____
493 West Martin Street        :
East Palestine, Ohio 44413     :
                                :

        and                 :
                                :

**JENNIFER GRAY**          : **COMPLAINT FOR DECLARATORY**
268 East Clark Street         : **JUDGMENT**
East Palestine, Ohio 44413     :

        and                 :
                                :

**MOORE'S TRUCKING**       :
129 ½ South Street          :
East Palestine, Ohio 44413     :
                                :

           Plaintiffs,         :
                                :

       -vs-                   :
                                :

**NORFOLK SOUTHERN RAILWAY** :
**COMPANY**                 :
c/o Statutory Agent          :
Corporation Service Company   :
3366 Riverside Drive, Suite 103   :
Upper Arlington, Ohio 43221    :          :
                                :
                                :

        and                 :
                                :

**NORFOLK SOUTHERN CORP.**   :
650 West Peachtree Street, NW   :
Atlanta, GA 30308           :
                                :

          Defendants.        :

1

## COMPLAINT FOR DECLARATORY JUDGMENT

## STATEMENT OF THE ACTION

1.      Plaintiffs Michael Loyd, Zoey Spellman, Jennifer Gray, and Moore's Trucking, on their own behalf and on behalf of all others similarly situated, bring this civil action for recovery of response costs incurred and/or to be incurred under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. § 9607(a). This action arises from Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation's (collectively "Norfolk Southern") releases and threatened releases of hazardous substances and "controlled" burning and release of hazardous substances from the derailment of Norfolk Southern freight train "32N" into the environment and the community in East Palestine, Columbiana County, Ohio ("East Palestine Train Derailment Site" or "Site").

2.      On February 3, 2023, Norfolk Southern train 32N, which was comprised of roughly 150 rail cars, derailed in East Palestine. At least 20 rail cars have been identified as carrying hazardous substances. Cars containing vinyl chloride, butyl acrylate, ethylhexyl acrylate, benzene, isobutylene, ethylene glycol monobutyl ether, and other hazardous substances discussed herein are known to have been and continue to be released to the air, groundwater, soil, and surface waters. The releases and threatened releases of hazardous substances also present a threat to streams and a buried valley aquifer. The derailment has resulted in contamination of and exposure to, at relevant times, massive amounts of hazardous substances. Such contamination and exposures are ongoing.

3.      This civil action also seeks declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that each Defendant is jointly and severally liable to Plaintiffs

for future response costs, including attorney's fees that they incur. Such response costs include investigation and monitoring costs and remedial costs that are consistent with the national contingency plan, in responding to releases and threatened releases of hazardous substances at, beneath, and/or related to the Site.

4.     Plaintiffs have incurred response costs, including attorneys' fees, and expect to continue to incur response costs in connection with actions taken in response to releases and/or threatened releases of hazardous substances at the Site.

5.     Defendants are and have been determined by the United States Environmental Protection Agency ("EPA") to be potentially responsible parties ("PRP") for the Site.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over claims in this Complaint under 28 U.S.C. § 1331 as this case arises under federal law, specifically Sections 107(a) and 113(b) and (g)(2) of CERCLA (42 U.S.C. §§ 9607(a), 9613(b), (g)(2)), without regard to the citizenship of the parties or the amount in controversy. This Court also has subject matter jurisdiction under 28 U.S.C. § 1355 (action for penalty) and 28 U.S.C. §§ 2201-02 (declaratory judgment).

7.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims that arise under the laws of the State of Ohio.

8.     Venue is proper in the Northern District of Ohio in the Eastern Division under 28 U.S.C. § 1391(b)(2), 42 U.S.C. § 9613(b), and Local Rule 3.8(a) because the claims brought herein arose and occurred in this District, specifically in Columbiana County. Further, the East Palestine Train Derailment Site and the releases and/or threatened releases of hazardous substances that are

the subjects of this Complaint are located in and/or occurred in Columbiana County, a county located in this District.

9.     The Court has personal jurisdiction over Defendants because each has regularly transacted business in and derived a benefit from the State of Ohio, including from Columbiana County, Ohio. Further, Defendants own and/or operate the Norfolk Southern Train 32N and the East Palestine Train Derailment Site that are the subject of this action.

## PARTIES

10.     Plaintiffs Michael Loyd, Zoey Spellman and Jennifer Gray are citizens of the United States and residents of the Village of East Palestine in Columbiana County, Ohio.

11.     Plaintiff Moore's Trucking is a Pennsylvania corporation with its principal place of business in the Village of East Palestine in Columbiana County, Ohio.

12.     Norfolk Southern Railway Company is a Class I railroad organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Norfolk, Virginia. Norfolk Southern Railway Company is a wholly owned subsidiary of Defendant Norfolk Southern Corporation. Norfolk Southern Corporation is organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Atlanta, Georgia. Norfolk Southern is a publicly traded corporation.

13.     Norfolk Southern operates on approximately 19,300 miles of track in 22 states and the District of Columbia and serves every major container port in the eastern United States. Norfolk Southern is a major transporter of industrial products including toxic chemicals.

## STATUTORY BACKGROUND

14.     CERCLA, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, codified at 42 U.S.C. §§ 9601-9675, was enacted "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." 96 P.L. 510, 94 Stat. 2767, 96 P.L. 510, 94 Stat. 2767.

15.     Section 107(a) of CERCLA establishes that "the owner and operator of a vessel or a facility" or "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" is liable for, *inter alia*, "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B).

16.     "Response" means "remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. at § 9601(25).

17.     "Remove" or "removal" means "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action

taken under section 104(b) of this Act [42 USCS § 9604(b)], and any emergency assistance which may be provided under the Disaster Relief Act and Emergency Assistance Act." 42 U.S.C. at 9601(23).

18.     "The term 'alternative water supplies' includes but is not limited to, drinking water and household water supplies." 42 U.S.C. § 9601(34). As such, alternative water and response costs include bottled water for drinking, bathing, and cooking.

19.     "Remedy" or "remedial action" means "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous

substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials. 42 U.S.C. § 9601(24).

20. "National Contingency Plan" or "NCP" is the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

## **FACTUAL BACKGROUND**

21. Norfolk Southern owns and operates a Class I freight railroad that passes through the town of East Palestine, Columbiana County, Ohio.

22. According to the Federal Railroad Administration, Norfolk Southern had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accidents total— 22 in 2019, 18 in 2020, 15 in 2021, and 13 in 2022.

23. According to the Federal Railroad Administration, Norfolk Southern also had the most derailments of all railroad companies in Pennsylvania from 2019 through 2022, with 74 accidents total, which is 89.2% of all derailments in Pennsylvania during this period.

24. In December 2022, the Government Accountability Office reported on Norfolk Southern's accident rate and found the company had hit a 10-year high in 2021.

25. There have been increased concerns across the railroad industry about the growing length of trains.

26. A Scripps News investigation found that Norfolk Southern's top executives personally were paid millions of dollars in incentives and cash rewards after the company hit a controversial financial target and made its trains longer.

27.     In Norfolk Southern's 2019 annual report, the company told shareholders that it had launched a major overhaul in its operations, saying it had begun "running fewer, heavier trains."

28.     Documents filed with the Securities and Exchange Commission show Norfolk Southern made significant changes to how top executives could qualify for large cash awards and tied those rewards to the "operating ratio."

29.     The operating ratio is generated by dividing operating costs by operating revenues. Records show this metric has grown in significance at Norfolk Southern in recent years.

30.     The goal is for the operating ratio to be as small as possible. Upon information and belief, increasing the length of trains can lower operating costs, which will lower the operating ratio.

31.     Derailments of longer trains can cause greater damage, larger pileups, and fires.

32.     There is currently no limit on train length, but the Federal Railroad Administration is studying the issue and noted this past December that "train lengths increased before infrastructure, technology, equipment, and operating practices could accommodate them."

33.     Legislative records obtained by Scripps News show Norfolk Southern has spent tens of millions of dollars over the years lobbying Congress and federal agencies—numerous times trying to block potentially costly safety reforms, including fighting against whistleblower protections and speed limits for high-hazard flammable trains. Norfolk Southern is also opposing a current federal effort to require a minimum number of crew members on a train. As recently as December 2022, the company told the Federal Railroad Administration that running trains with one-person crews is safe.

34.     In March 1, 2023 letters to Ohio Governor Mike DeWine and U.S. Department of Transportation Secretary Pete Buttigieg, Jonathon Long of the Brotherhood of Maintenance of Way Employees Division (BMWED) of the International Brotherhood of Teamsters criticized Norfolk Southern's cost-cutting business model, "Precision Scheduled Railroading," which has resulted in a "concentrated slashing of employees from the workforce (30% industry-wide since 2015, 21% for NS Maintenance of Way Employees)... Additionally, PSR involves eliminating fail-safes or preventative safety precautions that promote safer rail operations and help prevent disasters such as derailments."

35.     Norfolk Southern's pattern of conduct shows a "run it until it breaks" philosophy that puts profits above the health and safety of individuals. This corporate philosophy led to the catastrophic 32N Derailment on February 3, 2023, in East Palestine, Ohio.

36.     On February 3, 2023, Norfolk Southern train 32N comprised 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive located between railcars 109 and 110. Twenty of the cars were placarded hazardous materials tank cars transporting combustible liquids, flammable liquids, and flammable gas, including vinyl chloride.

37.     Train 32N was "notorious" and had been nicknamed "32 Nasty" by Norfolk Southern workers. "32N is widely known among workers as a difficult train to run, not because of especially difficult terrain or equipment, but as a result of management decisions about how the train would be put together." [Motherboard, "'32 Nasty:' Rail Workers Say They Knew the Train that Derailed in East Palestine Was Dangerous," February 15, 2023]

9

38.     At the time of the derailment, Norfolk Southern train 32N was nearly two miles long.

39.     Norfolk Southern train 32N was back-loaded with the heaviest tanker cars, comprising 40% of its weight, at the rear. Lighter cars were loaded between the heavier cars and the front engine.

40.     Train 32N was traveling from Madison, Illinois to Conway, Pennsylvania on main track 1 of the Norfolk Southern Fort Wayne Line of the Keystone Division, which runs through East Palestine, Ohio.

41.     The Norfolk Southern Fort Wayne Line of the Keystone Division required a downhill route.

42.     Norfolk Southern train 32N derailed at approximately 8:55 p.m. Eastern Standard Time (EST) on February 3, 2023, in East Palestine, Columbiana County, Ohio, less than a mile from the Ohio-Pennsylvania border.

43.     The train was already ablaze when it passed through Salem, Ohio at 8:13 p.m. EST, 20 miles west of the eventual site of the fiery derailment in East Palestine.

44.     Shortly before the derailment, the crew was alerted by an alarm indicating a mechanical issue with a malfunctioning railcar axle.

45.     Train 32N was operating with a dynamic brake application as the train passed a wayside defect detector on the east side of Palestine, Ohio, at milepost (MP) 49.81. On a diesel-electric locomotive, dynamic braking uses electric traction motors as generators, slowing the train and dissipating mechanical energy as heat.

46.     The Fort Wayne Line of the Keystone Division has a network of wayside defect detector, or hot bearing detector (HBD), systems to assess the temperature conditions of wheel bearings while en route. The function of the HBD is to detect overheated bearings and provide audible real-time warnings to train crews. Train 32N passed three HBD systems on its trip before the derailment. At MP 79.9, the suspect bearing from the 23rd car had a recorded temperature of 38°F above ambient temperature. When train 32N passed the next HBD, at MP 69.01, the bearing's recorded temperature was 103°F above ambient. The third HBD, at MP 49.81, recorded the suspect bearing's temperature at 253°F above ambient.

47.     Norfolk Southern established the following alarm thresholds (above ambient temperature) and criteria for bearings:

    a.  Between 170°F and 200°F, warm bearing (non-critical); stop and inspect.

    b.  A difference between bearings on the same axle greater than or equal to 115°F (non-critical); stop and inspect.

    c.  Greater than 200°F (critical); set out railcar.

48.     The HBD transmitted a critical audible alarm message instructing the crew to slow and stop the train to inspect a hot axle.

49.     The train engineer increased the dynamic brake application to further slow and stop the train. During this deceleration, an automatic emergency brake application initiated, and train 32N came to a stop.

50.     The railcar axle failed when a wheel bearing overheated on a railcar.

51.     The overheating led to a fire, which then led to the derailment.

52.     According to the National Transportation Safety Board's (NTSB) preliminary report on the derailment, although the train crew received alerts about the temperature of the

overheating bearing before the alarm was triggered, they did not act because the bearing's temperature had not yet reached the critical threshold defined by Norfolk Southern's procedures.

53.    When the NTSB released its preliminary report, NTSB Chair Jennifer Homendy said of the derailment, "This was 100% preventable."

54.    A total of 38 cars derailed and 20 of those cars were carrying hazardous substances: Vinyl Chloride, Stabilized (5 rail cars); Sulfuric Acid (5 rail cars); Ethylene Glycol Monobutyl Ether (1 rail car); Butyl Acrylate, Stabilized (2 rail cars); Combustible Liquids nos (1 rail car); Isobutylene (1 rail car); Ethyl-Hexyl Acrylate (1 rail car); Empty Residue – last contained liquified petroleum gas (LPG) (1 rail car); and Residue – last contained Benzene (2 rail cars).

55.    Norfolk Southern provided government officials with a list of the contents of the rail cars which derailed at the Site and information on the volume of materials in each rail car. Rail cars 23 through 74 were the rail cars which derailed, eleven of which contained hazardous materials. The hazardous materials contained in these eleven rail cars are as follows:

| Rail Car Number | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |
| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |

12

| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

56. **Vinyl chloride:** Vinyl chloride is particularly hazardous. Vinyl chloride is a known human carcinogen according to the Department of Health and Human Services (DHHS), the International Agency for Research on Cancer (IARC), and the EPA. Exposure to vinyl chloride is associated with a higher risk of liver, brain and lung cancers, and lymphoma and leukemia. Vinyl chloride is mutagenic and clastogenic, meaning that it can damage DNA (deoxyribonucleic acid) and chromosomes. Breathing high levels of vinyl chloride can cause dizziness, drowsiness and fatigue, headache, euphoria, irritability, nervousness, sleep disturbances, nausea, visual and hearing disturbances, and loss of consciousness. Breathing very high levels can cause fainting, and breathing even higher levels can cause death. Dermal exposure may cause numbness, redness, and blisters. Animal studies have shown that exposure to vinyl chloride during pregnancy can affect the growth and development of the fetus.

57. **Sulfuric Acid:** Sulfuric acid is a corrosive substance that can severely irritate and burn the skin and eyes. Inhalation can irritate the eyes, nose, throat, and lungs, and at higher levels can cause a buildup of fluid in the lungs (pulmonary edema). Exposure can cause headaches, nausea and vomiting. Repeated exposure may cause bronchitis, permanent lung damage, damage to teeth, and upset stomach. It is a carcinogen in humans.

58. **Ethylene Glycol Monobutyl Ether:** Routes of exposure include ingestion and dermal contact. Inhaling Ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain. Exposure can cause headache, dizziness, lightheadedness, and passing out. It may damage the liver and kidneys.

59.     **Butyl Acrylate:** Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy. Exposure to butyl acrylate can cause headaches, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

60.     **Isobutylene:** Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat; dermal contact can cause frostbite; headache, dizziness, lightheadedness, and fatigue. Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer hazard, reproductive hazard, and other long-term health effects.

61.     **Ethyl-Hexyl Acrylate:** Ethyl-hexyl acrylate can cause skin and respiratory irritation and inhalation of concentrated vapor causes drowsiness and convulsions. Heat can result in severe polymerization with rapid release of energy and sealed containers may rupture explosively if hot.

62.     **Benzene:** Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death. The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels. Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research on Cancer (IARC), and the EPA.

63.     Norfolk Southern reported the derailment at 10:53 p.m. EST on February 3, 2023 to the National Response Center (NRC). Federal, state, and local officials arrived on scene after the derailment.

64.     The derailment resulted in the release of hazardous substances and a large fire affecting numerous rail cars, including rail cars carrying hazardous materials. The fire continued to burn with increasing intensity the following Saturday, Sunday, and Monday (February 3-6, 2023).

65.     On Friday February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled below Beaver Falls, Pennsylvania.

66.     The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of a rainstorm or snowstorm on radar. The smoke plume was blown to the south and east due to a northwest wind that was blowing over the fire, traveling at least as far as Bridgewater, Pennsylvania at that time.

67.     Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.

68.     The area immediately south of the Site is a mixed-use commercial, industrial, and residential area. The area north of the Site is a commercial and industrial area, with additional residences to the northeast. The nearest residences are within hundreds of feet of the derailment Site.

69.     Residential properties are also located along contaminated waterways which became contaminated after the derailment and are within the affected area.

70.     The nearest public well supply is located approximately one (1) mile from the derailment location. Dozens of private wells are located within a one-mile area of the Site.

71.     A ditch, located on the south side of the tracks, flows west for approximately 1,000 feet before it empties into Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek before emptying into the Ohio River. Wetlands and State Line Lake are located immediately adjacent to the northeast side of the Site. Segments of the affected waterways are considered to be habitat for the Eastern Hellbender, an endangered species of salamander.

72.     Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people, and an evacuation order was put in effect within a mile of the train derailment at 1020 East Taggart Street as of early Saturday, February 4, 2023.

73.     Jonathon Long of the BMWD noted in his March 1st letters to Secretary Buttigieg and Governor DeWine that as residents of East Palestine were being evacuated in the aftermath of the derailment, Norfolk Southern was focused on getting its trains moving again, and "instructed approximately 40 of its Maintenance of Way Employees to come on site and begin cleaning up the wreckage." Mr. Long received reports that Norfolk Southern "neither offered nor provided these workers with appropriate personal protective equipment" such as respirators, eye protection and protective clothing to prevent direct contact with the spilled chemicals and that many workers reported experiencing migraines and nausea days after the derailment.

74.     Upon information and belief, one railcar carrying vinyl chloride became a focus of concern when its malfunctioning safety valves prevented the release of the chemical inside, meaning that pressure was building to unsafe levels inside the steel shell.

75.     On Sunday, February 5, 2023, as the fires continued to burn, temperature increases raised fears of a catastrophic tanker failure.

76.     At 4:30 p.m. on Monday, February 6, 2023, Norfolk Southern intentionally blew holes in each of the five derailed rail cars containing vinyl chloride in a purported effort to drain the chemical into a trench where flares would then ignite and burn the vinyl chloride away. This process was referred to as a "controlled release," but it was anything but controlled.

77.     Upon information and belief, phosgene, hydrogen chloride, and dioxins were created by the "controlled burn" and release of vinyl chloride.

78.     Phosgene is a poisonous gas that is also a chemical warfare agent banned under the Geneva Convention. Exposure to phosgene in the air can cause eye and throat irritation, vomiting, cough, foamy sputum, breathing difficulty, and chest pain. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion. Inhalation is the major route of phosgene exposure. The odor threshold for phosgene is 5 times higher than the OSHA PEL. Thus, odor provides insufficient warning of hazardous concentrations. Phosgene's irritating quality can be mild and delayed, which may result in a lack of avoidance leading to exposure for prolonged periods. Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause

frostbite. Phosgene was used as a chemical weapon during World War I and was referred to as a "choking agent." It led to the vast majority of chemical weapons deaths, about 85,000 people, in World War I. Phosgene gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level. Phosgene damages metals in the presence of moisture.

79.     Hydrogen chloride is a poisonous gas. Hydrogen chloride is extremely unstable and bonds with water in the atmosphere to form hydrochloric acid. Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation. Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation. Some people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin. Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach. Hydrogen chloride gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level.

80.     Dioxins are a group of compounds that are persistent environmental pollutants known to bioaccumulate in animals and humans. According to the U.S. EPA, dioxins are highly toxic, can interfere with hormones, and can cause cancer, reproductive and developmental problems, or damage to the immune system.

18

81.     In advance of the "vent and burn" releases, the evacuation radius was increased to a roughly one-mile by two-mile area pursuant to evacuation orders issued by state officials.

82.     Following the explosive and fiery "controlled release," a large plume of thick black chemical smoke formed a mushroom cloud, which released and dispersed toxic phosphene gas, hydrogen chloride, and dioxins into the atmosphere, causing further contamination by, and exposure to, toxic chemicals.

83.     One local hazardous waste official has described that the "…plume cloud covered a very large area. I got a picture from an airplane taking off from Pittsburgh, and there is this huge black spot in the middle of the clouds." He also described the "controlled release" as follows: "We basically nuked a town with chemicals so we could get a railroad open. . . . We didn't use a nuclear weapon, but we did nuke them with chemicals."

84.     Local citizens reported smoke from the burns observed over the State of Ohio and the Commonwealth of Pennsylvania.

85.     The chemical smoke from the release was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud.

86.     Fumes, sediment, and a rise in particulate pollution from the derailment, fire, toxic chemical disbursement, and subsequent explosion have been reported throughout an area encompassing at least 30 miles around the derailment site.

87.     For example, the EPA particulate pollution monitor in Youngstown, Ohio, more than 23 miles from the derailment site, more than tripled in amount of small particles in the air on

February 6, 2023, and continued to rise. As of February 9, 2023, the particulate levels in Youngstown, Ohio were five times higher than they were prior to February 6, 2023.

88.     Acrylate odors were noted by responders during indoor air monitoring.

89.     Acrylate odors along Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek were noted by responders during sampling and containment activities.

90.     While regulatory officials have admitted that dioxins had likely been released by the burning, testing for dioxins was not being done and would "probably be part of a long-term mitigation strategy." It was not until March 2, 2023, twenty-three (23) days after the "controlled" burn that caused the visual releases, that EPA ordered initial testing for dioxin. Despite the limited testing to-date, dioxins have been measured at concentrations above regulatory limits in media impacted by the release. More extensive testing and investigation is needed to respond to the releases and/or threatened releases.

91.     The derailment resulted in releases to the air when hazardous substances spilled from the rail cars, when smoke from burning rail cars was produced, and hazardous substances including vinyl chloride, phosgene and hydrogen chloride were released.

92.     The derailment resulted in releases to surface water when liquid product exited rail cars and also when run-off from firefighting efforts at the derailment location moved through a ditch to Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek, and then the Ohio River.

93.     The derailment resulted in releases to soil when liquid product exited rail cars after the derailment, when run-off from firefighting efforts at the derailment location flowed from the right-of-way to adjoining property, and when ash from the burns landed on soil.

94. Five train cars holding vinyl chloride were vented and burned, releasing 1.315 million pounds of vinyl chloride and its combustion byproducts, including phosgene and hydrogen chloride that contaminated and continued to contaminate the environment and exposed and continue to expose the community.

95. For context, the highest emitter of vinyl chloride in the United States discharged 68,346 pounds of vinyl chloride in 2021. The total for all emissions of vinyl chloride in that year was 428,522 pounds.

96. With the February 3 derailment and its aftermath, Norfolk Southern discharged more cancer causing vinyl chloride into the environment in the course of a week than all industrial emitters combined did in the course of a year.

97. The EPA has determined that populations at risk include:

   a. Human residents;

   b. Human workers;

   c. Wildlife including, but not limited to, several fish species as well as the eastern hellbender, an endangered species with habitat within portions of the affected waterways; domesticated pets; and agricultural area which supply the human food supply and the animal food chain.

98. Removal of the contaminated solid and water has involved at least seven different hazardous waste disposal facilities in Ohio, Indiana, Michigan, and Texas. The EPA enacted a one-day pause on the removal actions in East Palestine after Michigan and Texas officials raised concerns about waste from the East Palestine disaster being sent to facilities in their states without notice. Although the EPA has identified seven sites that will accept the waste, the sites do not have enough combined capacity to hold all of the waste, necessitating an ongoing search.

99.     Prior to the excavation, Norfolk Southern routed hazardous substances into a pit that Norfolk Southern had dug. Upon information and belief, a portion of those chemicals were then set on fire. However, prior to and after that, the hazardous substances migrated and continue to migrate into the ground and groundwater beneath the pit.

100.     Without any serious testing of homes, water, and soil for contaminants, residents were sent back to their homes and rail traffic through the town quickly resumed.

101.     Residents have reported thousands of dead fish in local streams and the persistence of chemical smells and sickness among residents.

102.     Residents, including Plaintiffs, have reported experiencing noxious fumes, and numbed tongues and lips from the derailment, fire, toxic chemical disbursement, and subsequent explosion.

103.     The U.S. Environmental Protection Agency sent a letter to Norfolk Southern claiming Norfolk Southern failed to properly dispose of contaminated soil after the train derailment in East Palestine. According to the letter, "Five railcar tankers of vinyl chloride were intentionally breached; the vinyl chloride was diverted to an excavated trench and then burned off. Areas of contaminated soil and free liquids were observed and potentially covered and/or filled during reconstruction of the rail line including portions of the trench /burn pit that was used for the open burn off of vinyl chloride."

104.     Public officials have reported an estimated number of aquatic animals killed at approximately nearly 40,000. Those aquatic animals were found in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Most of the fish appear to be suckers, minnows, darters, and sculpin. Most of these deaths are believed to have been caused by the immediate release of contaminants into the water.

105.    Additionally, waste piles containing mixtures of vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether remain on site and pose a threat of exposure should containment be compromised.

106.    Rainfall events have the potential to cause further releases to surface waters. Dry weather and remediation activities have the potential to result in the release of contaminated soils by tracking or dust emissions. Indeed, on March 3, 2023, a dam holding back contaminated materials was breached during a rain event, resulting in a release of hazardous substances into the environment and threatening the environment and health.

107.    Threat of fire or explosion is present at the Site due to the continued presence of rail cars containing isobutylene (DOT Class 2.1 Flammable Gas) and residual benzene (DOT Class 3 Flammable Liquid).

108.    The Site may pose threats to public health or welfare or the environment because full assessment of the extent of contamination has not been completed.

109.    The releases of hazardous substances from the Site have impacted drinking water, resulting in the closures of water intakes on the Ohio River, and have the potential to affect groundwater used for drinking water and irrigation.

110.    The EPA has determined that the Site may constitute an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from the facility within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

111.    The conditions at the Site may constitute a threat to public health or welfare or the environment based on the factors set forth in Section 300.415(b)(2) of the NCP, including:

a.  actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances and pollutants or contaminants;

b.  actual or potential contamination of drinking water supplies or sensitive ecosystems;

c.  hazardous substances and pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

d.  high levels of hazardous substances and pollutants or contaminants in soils largely at or near the surface, that may migrate;

e.  weather conditions that may cause hazardous substances and pollutants or contaminants to migrate or be released;

f.  threat of fire or explosion; and/or

g.  other situations or factors that may pose threats to public health or welfare or the environment.

112.  Plaintiffs incurred necessary costs in response to the derailment and release and/or threatened release of hazardous substances. These costs incurred include cost of evacuation, temporary relocation, housing, alternate water supply, attorney's fees and investigative costs (relating to cleanup, technical services and identifying PRP), and consultant investigative and response costs.

113.  Plaintiffs will incur future costs in response to the derailment and release and/or threatened release of hazardous substances.

## CLAIMS FOR RELIEF

## COUNT ONE – CLAIM FOR RESPONSE COSTS AND DECLARATION OF LIABILITY FOR FUTURE RESPONSE COSTS UNDER CERCLA

114.   Plaintiffs incorporate all allegations contained in the preceding paragraphs as if fully rewritten herein.

115.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . .

shall be liable for –

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . .

116.   Norfolk Southern is a liable party under one or more provisions of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a):

a.   Norfolk Southern is the "owner" and/or "operator" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

b.   Norfolk Southern is the "owner" and/or "operator" of the facility at the time of disposal of hazardous substances at the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

117.   Norfolk Southern is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

118.    The East Palestine Train Derailment Site is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

119.    Norfolk Southern Train 32N and the individual rail cars comprising the train are "rolling stock" and therefore are a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

120.    The contaminants vinyl chloride, benzene, and butyl acrylate found at the Site are each a "hazardous substance" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14) that may present an imminent and substantial danger to public health or welfare under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1).

121.    Plaintiffs are "persons" as defined by Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

122.    As a direct and proximate result of the derailment of Norfolk Southern Train 32N and the individual rail cars comprising the train, Plaintiffs have been exposed to hazardous substances at or around the Site and have incurred and will continue to incur response costs.

123.    Plaintiffs are entitled to declaratory judgment on liability against Defendants, under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that will be binding in any subsequent action to recover further response costs incurred by Plaintiffs in connection with the Site.

**WHEREFORE**, Plaintiffs demand judgment against Defendants and request that the Court:

A.    Enter declaratory judgment, under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), of Defendants' liability to reimburse Plaintiffs their response costs incurred;

B.    Enter declaratory judgment, under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), of Defendants' liability, which will be binding in any subsequent action against

Defendants seeking to recover further response costs incurred by Plaintiffs in connection with the Site;

      C.      Awarding Plaintiffs their costs of litigation, including reasonable attorneys' fees and expert witness fees responding to the release and threatened release; and

      D.      Granting any such other relief as the Court deems just and proper.

Dated: March 23, 2023               Respectfully submitted,

 

*/s/ Daniel N. Abraham*
Daniel N. Abraham (0023457)
David I. Shroyer   (0024099)
Michael T. Rapier (093836)
***Colley Shroyer & Abraham Co. LPA***
536 South High Street
Columbus, Ohio 43215
T: (614)228-6453
F: (614) 228-7122
E: dabraham@csajustice.com
E: dshroyer@csajustice.com
E: mrapier@csajustice.com
Trial Attorney for Plaintiffs


*/s/ D. David Altman*
D. David Altman (0021457)
Justin D. Newman (0080968)
Amy J. Leonard (0040611)
***AltmanNewman Co. LPA***
15 East 8th Street, Suite 200W
Cincinnati, Ohio 45202
T: (513) 721-2180
F: (513) 721-2299
E: daltman@environlaw.com
E. jnewman@environlaw.com
E. aleonard@environlaw.com
Co-Counsel for Plaintiffs

*Attorneys for Plaintiffs*